We'll hear next in the Firefighters Union against the City of East Chicago. May it please the court, we'll wait for counsel to find a seat at the table. Sorry about that. Mr. Tolbert. Good morning, Your Honor. May it please the court, ladies and gentlemen that are present, the students. My name is Michael Tolbert. I represent the City of East Chicago, and I represent also Mayor Copeland. And we're here today because of an injunction order that was entered on March 28, 2022, that arose out of a scheduling at a fire department in the City of East Chicago. Their original schedule was a 24-48 schedule. The mayor, who was a mayor that was elected in 2010, who ran on saving money and keeping taxpayer dollars down, changed the schedule in order to save money to an 8-24 hour schedule. Well, that's what your client, the mayor, said. But it's not what the district court found. That's correct, Your Honor. And, of course, you need to deal with the district court's findings of fact. That is correct, Your Honor. And I believe that the briefing and what I'm here to do today is to show that the district court just simply got it wrong. As Your Honor is aware, the abuse of discretion standard is what governs us. No, the standard is whether the finding is clearly erroneous. That is correct, Your Honor. And I believe that the findings were clearly erroneous. And there are a number of facts in the order that I will go through really quickly to show that the findings of fact were clearly erroneous, which led to an abuse of discretion. So the first point I'll make, Your Honor, is the finding that the underlying district court arrived at was that this schedule was put in place for political reasons, and that this was political retaliation because of the firefighters' lobbying efforts with the city council. I found it strange, Your Honor, throughout the two-day hearing, there was an audio that was also submitted to this court that came up in our preliminary injunction hearing that was a secretly recorded November 2, 2019, recording where the firefighter, Mata, who was also a plaintiff, who was one of the only testifying firefighters, secretly recorded one Chief Cerna. And then when the hearing came up, they essentially did not want to produce that audio, and there's good reason why. The audio clearly showed over two hours and, I believe, 30 minutes of prodding and leading questions from firefighter Mata trying to get Chief Cerna to say that the decision to implement the schedule was based on political reasons, you will hear in that two-and-a-half hours there was no such utterance, there was no such specific statement. But yet and still, Your Honors, the district court somehow in some way in that two-and-a-half hour audio found that Chief Cerna said that it was payback time, and that was the reason why the schedule was being implemented. Well, the district court didn't quote payback. The district court didn't say that the Chief had said payback. He said that based on the evidence, that's essentially what he was saying. Your Honor, I believe that what the record reflects is that the order, the injunction order said it, Chief Cerna said it is payback. When the district court was quoting what the Chief said, the district court used quotes in the opinion. The district court didn't quote it's payback time. I agree, Your Honor. The district court did not actually quote that phrase, but they in fact said, based on a finding, that it was payback time. And then they, in my opinion, made a leap in logic by pointing out that there were certain things that were done that were considered political retaliation. But how was it clearly erroneous for the court to find that when the court quoted the Chief saying during that meeting, you can call it retaliation, and I'm going to call it, we know what it is you want, what you're going for, so we have to prepare for that. How is that clearly erroneous? That is clearly erroneous, Your Honor, because you just said it. He said specifically what the reason was for the change, which was preparing for the future, preparing for what the mayor, who was a small town mayor. It sounds like you're asking us to re-weigh the evidence here. Of course not, Your Honor. I would not be here and drive an hour to do that because I know that would get me nowhere. But what I'm asking you to look at is the clear record and to look at the logic of the district court's whole opinion. I shouldn't say whole opinion, but one of the cruxes of their decision was this audio that the firefighters didn't even want to produce. And then when you listen to the audio, the audio doesn't say anything close or remotely close to any claims of political retaliation. In fact, the record shows the opposite. The last comment in that audio was you have a fundamental right of free speech. That doesn't sound like political retaliation. Also, he said, Chief Cerna, in that audio specifically said the reason that he was making the decision to change that schedule was because of the public interest and to save taxpayer dollars. The district court missed that complete two and a half hour audio and focused on a part which actually doesn't even support the proposition that this decision was political retaliation. And it clearly was erroneous when they did that. And that, I believe, was clear. He talked about the protect. He, quote, Chief Cerna said this was put in place to protect the public interest. And I don't their students here, so I won't use colorful language. But he actually cursed and said it was the ordinance that messed all of this up. Didn't say it was the firefighters lobbying efforts. He said it was the ordinance, which is the whole point of why the district court's decision to say that it was somehow their conduct was clearly erroneous. The next point is this MOU. The court missed the ball on the MOU. The what? You were here for the last argument. I was here for the last argument. So would you use real English words rather than initialisms that no one but you understands? I got you, Your Honor. The court messed up bad by saying that this MOU was the whole basis. Would you use real English words rather than initialisms that no one but you understands? Okay, Your Honor. I will say the court committed error. They committed error by saying that this MOU was. No, you're not getting it. MOU is an initialism that nobody but you understands. I understand, Your Honor. I want you to use real English words. I understand, Your Honor. MOU is not a real English word. I get it now, Your Honor. You get it now. I do. It's a long time coming. Sorry about that. The MOU is a memorandum of understanding is what the term is. And there was a memorandum of understanding that the district court indicated that proved that there was political retaliation because somehow, someway, the mayor implemented the schedule because of a memorandum of understanding that he, one, didn't draft, that it actually came from the firefighters, and that he actually didn't even commit or put any of the terms into it. And I think the other point that I think is crucial about this memorandum of understanding is that on this November 2, 2019, during the secret recording, Chief Cerna and Firefighter Mata were talking about the implementation of this memorandum of understanding. The memorandum of understanding was discussed on December 2, 2019. So if you look at the logical timeline, the schedule was already about to go into effect. So how can the city or the mayor penalize the firefighters for signing a document that wasn't even in effect when the schedule was implemented? So the timeline, Your Honor, is a problem. But it was shortly after they declined to sign the memorandum of understanding that the schedule went in effect. That is correct. That's what the district court relied on. The district court relied, if you look at the record, Your Honor. I did. That's what the district court relied on. The district court indicated that the memorandum of understanding was the basis behind why the city implemented the eight-hour schedule. The point is that the eight-hour schedule was already on the train tracks and running. And then, Your Honor, at the record, if you look at the Facebook post from the city of Chicago's mayor, he specifically says that this MOU was not being implemented for retaliation and was being implemented for efficiency. So the district court completely ignored that. No, but the district court did not. The district court went on to note that the mayor's own Facebook page said that by not signing that, it left them with, quote, no choice but to move on with the schedule change. The memorandum of understanding, which was the idea of the union. It was the idea of the union who drafted and put the terms of the memorandum of understanding in place. And once they, negotiations broke down, then the original schedule that was already in place, that was about to go in place, was already implemented, Your Honor. Thank you, Mr. Tolbert. Thank you, Your Honor. Mr. Tolbert, lawyers sit at council table during the argument. Good morning, and may it please the court. My name is Sarah Fahlman, and I represent the International Association of Firefighters, Local 365, as well as 38 current and former firefighters of East Chicago. What we heard here today was the city's request and the mayor's request that this court re-weigh the evidence. That is not the role of this court. The firefighters, during a two-day evidentiary hearing, demonstrated that they have a likelihood of success on the merits of their First Amendment claim, that irreparable real harms would result without an injunction, that the balance of equities tips in their favor, and that the injunction is in the public's interest. And the reason why there is no real factual dispute as to motivation is because Chief admitted themselves that they instituted this rotating, continuous schedule because of the firefighters' lobbying efforts. Their words are our smoking gun here. So let's hear some of their words. So suppose that the state of Illinois goes to Congress and lobbies for higher appropriations, and that members of Congress don't like it, and the result is lower appropriations. Does that violate the First Amendment? I'm not entirely sure the answer to that question, to be frank, Your Honor. I should think the answer is no, unless you're willing to contend that politics itself violates the First Amendment because the losers in politics lose. But that seems to be your argument, that lobbying went on and the losers lost, and therefore politics is unconstitutional. That is not our argument, and that is not all that went on as politics went on. As the firefighters established at the hearing, they endorsed and campaigned for pro-public safety candidates. Look, do I have to spell out my hypothetical? Illinois goes to Congress and says, we're Democrats. We Democrats are in favor of bigger spending. We want more money. And many members of Congress say, we're Republicans. We're in favor of smaller spending. We're actually going to cut the amount of money you get. It doesn't seem to me better or worse for injecting the words Democratic and Republican into it. It might explain why politics comes out as it does, but that seems to me functionally equivalent to the kind of argument you're making, that there was a lobbying input and an outcome made things worse from the perspective of the lobbyist. I'm trying to figure out why that violates the First Amendment. Now, of course, your opponent did you a big favor by not making any argument along these lines. Your opponent just accepted the premise of your suit. But I'm wondering whether the premise of your suit is compatible with the Constitution. And I would say it is, Your Honor. And that is because opinions about pending legislation, those are matters of protected activity. And in this court's 2009 decision. So then you have to answer my question by saying, yes, the reduction of Illinois' subsidy from the federal government violates the First Amendment. I'm sure you don't want to answer that yes, because you can see the primrose path you are being led down. But you then need to tell me why your case isn't exactly like my hypothetical. And I would like to do that, Your Honor. So the First Amendment protects the rights of my clients, both the union and the union members, to petition the government for a redress of their grievances. True in my hypothetical. And in this particular instance, the union and the members did just that. True in my hypothetical. I haven't distinguished it yet. Correct. And those lobbying efforts failed. The legislation did not pass. True in my hypothetical. But what the mayor was worried about, his fear, what he wanted to do was prevent these firefighters from doing it again. He wanted to show. True in my hypothetical. They want to cut the money permanently. He wanted to shut down their ability, not just to cut the money, but to lobby on their behalf before city council for matters that affect both their own employment. In my hypothetical, the state losing a lot of money will surely discourage them from similar lobbying activities. Yep, that's what happens in politics. I understand. But in your hypothetical, I would say that it is different here because these are individuals who are speaking as private citizens on matters of public concern, and they are being punished for it. And the punishment was real and severe. And in my reading of the case law coming out of this court and others, things like public endorsements of candidates, those are expressions of views that are protected by the First Amendment. Those are things that my clients did here. The firefighters in the union endorsed the mayor's opponents, and they supported members of the common council that they knew would be able to override the mayor's veto on any future salary ordinances. In this activity, lobbying, engaging in the democratic process, these are protected and fundamental First Amendment rights that my clients have. You're not getting my problem. I mean, it seems to me you have given your opponents choice of argument. You have a very easy path here. But the kind of point you're making is true of every political fight where the loser in politics may well be worse off than he was before he began the fight. That's why I think that you're arguing that politics violates the Constitution, and that can't possibly be right. My response to that is it's not politics. It's their First Amendment ability to speak. Losing. Right. Politics is a fight among different perspectives of government, and people who lose in a political race may find themselves worse off. And your argument is that if you engage in politics, which is protected by the First Amendment, and find yourself worse off, your constitutional rights have been violated. And that means politics violates the Constitution. That's what it means. And if I just may, my argument is actually that you cannot be punished for trying to engage in politics as a private citizen. And the case law is clear on that in the First Amendment. And this is what happened here. My clients— Actually, you're—I don't think my point is getting across. You're relying on a bunch of cases where a particular person is singled out for poor treatment. What happened in this case was not the lobbyist being singled out for poor treatment. It was a change in policy that affected every firefighter—the mayor's supporters, the mayor's opponents, every firefighter. Right? The argument you're making is that what's true for a single individual has to be true at the level of policy choice as well. And that's what's getting me concerned. And, Your Honor, I would say under the Supreme Court's 2011 decision in Burrough, which is 564 U.S. 379, it sets forth a semi-answer to your question, where the right of a public employee is a right to participate as a citizen through petitioning activity in the democratic process. And that's what these clients did here. And it wasn't just a policy change. It was a policy change designed to, and which did, cause real harms to each and every one of the firefighters as well as to the potential public safety of the— You're just not doing anything that tackles my hypothetical. Taking a billion dollars away from Illinois harms everyone in the state. The difference here is that the mayor took something from those firefighters because they decided to engage in political activity. It's not the politics themselves. It's the actions that they took. The speaking at city council meetings, the engaging in conversations with council members to draft this 2019 salary ordinance. It's those actions that the mayor wanted to stop. He wanted to shut it down. His words that he gave at the preliminary injunction hearing demonstrate that he was angry that they took positions opposed to him and that he wanted to punish them. And that punishment had real effect. The union and its members stopped speaking out. They were asked to avoid commenting to newspapers and to the public. But it chilled their ability to participate in free speech, which is guaranteed by the United States Constitution. Was there any economic loss for the firefighters? There very well may be, but that was not an issue for the preliminary injunction hearing because we were dealing with irreparable harms. There were some firefighters who were forced to expend additional dollars on child care, elderly care, additional transportation costs, loss of second jobs. But the real harms at issue in the preliminary injunction were those that cannot be made whole at a later date. They increased anxiety. They gained weight. They lost the ability to sleep. And that has a real world implication for firefighters who run into burning buildings day in and day out. They need to be at their best. They need to be well rested. They need to be able to be cohesive as a team. And an assistant chief at the hearing found that the schedule prohibited that from happening. Thank you, Your Honors. Thank you. Case is taken under advisement.